## Case No. 17,962.

WOOD et al. v. The SALLIE C. MORTON.

[11 Chi. Leg. News, 377; 2 N. J. Law J. 301; 25 Int. Rev. Rec. 241.]

District Court, D. New Jersey. Aug., 1879.

GENERAL AVERAGE — LACHES — ENFORCEMENT OF CLAIM.

Libellants who might otherwise be entitled to contribution under general average, may lose it by laches in enforcing their claim, as against a mortgagee whose debt was a maritime lien before he waived it for the mortgage security.

[This was a libel by R. D. Wood and Walter Wood against the schooner Sallie C. Morton, for the non-delivery of freight.]

NIXON, District Judge. The libel is filed in this case against the schooner Sallie C. Morton to recover the losses sustained by the libellants for the non-delivery of portions of two several cargoes shipped on board of said vessel at different times in the fall of 1877. The libel alleges that the first shipment consisted of sixty-eight tons and 2,085 lbs. of iron pipe put on board at the port of Millville, in the state of New Jersey, on the fifteenth day of September, 1877, to be carried and transported by said schooner to the ports of Green Island and Troy in the state of New York, eight tons and 2.025 lbs. to be delivered to the Kingsboro Water Works at Green Island, and sixty tons and 60 lbs. to the water works commissioners at Troy, for the freight of $1.50 per ton; that the libellants received two bills of lading from the master of the schooner of like purport and contents, in which the said master covenanted to make safe delivery of said cargo (the damage of the sea only excepted), but that owing to the negligence and want of proper care on the part of the master and crew, a portion of the said cargo, to wit: eight tons and 1,234 lbs. of iron pipe became lost, and have not been delivered to the Kingsboro Water Works or to the Troy water commissioners, to the damage of the libellants two hundred and seventy-one dollars and sixty-seven cents. The libel further alleges that the second shipment consisted of one hundred and twenty tons of pig iron, which the libellants put on board at the port of Albany, New York. on the twenty-fifth day of October, 1877, to be carried to the port of Millville, New Jersey, for the freight of $1.50 per ton, but that owing to

the negligence and want of proper care on the part of the master and his crew a portion of said cargo, to wit: twenty-eight tons and 2,144 lbs. of pig iron, became lost, whereby the libellants sustained damage in the sum of five hundred and six dollars and seventy-seven cents. The respondent, Nathan Pennell, intervenes as mortgagee of the schooner, and sets up in answer to the libel that the libellants are not entitled to recover, because portions of the two several cargoes had been loaded on the deck of the vessel with the consent of the libellants, and had been lost, if lost at all, by being cast overboard on the high seas on account of stress of weather, and charges that the said jettisons were necessary to secure the safety of the vessel and the balance of the said cargoes.

It will be perceived that the defense set up is that the jettisons were from a part of the cargo on the deck of the vessel, and which was loaded there with the consent of the shippers. It will also be observed that the master had given to the owners of the first cargo of iron pipe a clean bill of lading, but that the second cargo of pig iron was a mere parol shipment. It is a well settled rule that a clean bill of lading, i. e., a bill of lading which is silent as to the place of stowage, imports a contract that the goods shall be stowed under the deck. This was the precise question before the supreme court in the case of The Delaware, 14 Wall. [81 U. S.] 579, and it was held that under such a bill of lading parol evidence that they were to be stowed on deck was inadmissible. The court would not allow the written contract to be varied or contradicted by proof that the shipper consented to the stowage on deck; but at the same time it carefully limited the decision to the case where no usage or custom of a particular trade is shown sanctioning the stowage on deck, and a strong intimation being thrown out that if proof of such an usage had been offered it would have been admissible. It not being competent to contradict the bill of lading by parol testimony of the shipper's acquiescence or consent, has there been such proof of usage in this particular trade as to establish the presumption that the contract was entered into with knowledge of such usage? No witnesses have been examined upon the subject, except two of the witnesses of the libellants (a fuller examination would have been more satisfactory); one of these was James B. Pitts, who was the mate of the schooner; and in testifying as to the custom of the trade in loading iron, he says: "We always put a little iron on deck, when we are loaded with iron, to make the vessel easier at sea. It is always customary when loading a vessel with iron to load some portion of it on deck. I never knew a vessel loaded with iron entirely under deck, either pig iron or pipes. * * * Iron loaded partly on deck, and not at all in the hold, does not strain the vessel so badly, and makes her easier in a heavy sea. * * * I started to follow the sea in 1849, and have done nothing of consequence since." Mr. Cranshaw, in the employ of the libellants, testifies that "they had from time to time been chartering this schooner for the last five or six years; that the captain never took a full load in the hold of the vessel, and whilst the witness did not know in this particular instance who ordered any part of the cargo on deck, he did know from his three years' experience in the employment of the libellants at Millville, N. J., it was the almost universal custom to load such cargo part on deck and part in the hold." In the absence of any contradictory evidence it would seem to appear that the custom or usage of the iron trade was an excuse to the master for unloading in these instances a portion of the cargo upon the deck of the vessel, and the libellants are not entitled to payment for the full value of their loss, the jettisons being shown to have been necessary for the safety of the vessel and the residue of the cargo.

The advocate for the libellants, however, insists that if this be so, they, nevertheless, have a lien on the vessel for the contributory share due from the vessel on an adjustment of the general average, and he relies upon Du Pont v. Vance, 19 How. [60 U. S.] 162, as an authority to recover the same in these proceedings. That case undoubtedly justifies such relief if the facts of the whole transaction bring the case within the principles of average contribution. The court there say: "When a lawful jettison of cargo is made, and the vessel and its remaining cargo are thereby relieved from the impending peril and ultimately arrive in the port of destination, though the shipper has not a lien on the vessel for the value of his merchandise jettisoned, he has a lien for that part of its value which the vessel and its freight are bound to contribute towards his indemnity for the sacrifice which had been made for the common benefit." See Ben. Adm. § 295. But the jettisons in this case were from the deck, and the weight of authority in this country is, that in the case of a jettison of a deck load, to avoid the dangers of the seas, the owner is not entitled to the benefit of a general average. 3 Kent, Comm. 240; Smith v. Wright, 1 Caines, 43; The Paragon [Case No. 10,708]; Cram v. Aiken. 13 Me. 229; Hampton v. The Thaddeus, 4 Mart. (La.) 582; Wolcott v. Eagle Ins. Co., 4 Pick. 429; Taunton Copper Co. v. Merchants' Ins. Co., 22 Pick. 108; Barber v. Brace. 3 Conn. 13; Doane v. Keating. 12 Leigh, 391; Lawrence v. Mintum, 17 How. [58 U. S.] 100; The Milwaukee Belle [Case No. 9,627]. I say the weight of authority is in that direction, but there are cases where it has been urged and held that the custom of a particular trade, or the consent of a shipper to load on deck, makes an exception to the general rule, and allows con-

tribution from the ship owner for a loss by jettison. Gould v. Oliver, 4 Bing. N. C. 134, and Johnson v. Chapman, 19 C. B. (N. S.) 563 (19 J. Scott, N. S.) in England, and Vernard v. Hudson [Case No. 16,921]; The Delaware, 14 Wall. [81 U. S.] 602; and The Watchful [Case No. 17,250],—in this country; afford strong support to the doctrine or principle last stated, and I should be inclined to follow these authorities, rather than the others, if the present case did not show such laches on the part of the libellants, in enforcing their claim, that they ought not now be allowed to prevail against a mortgagee, whose debt was a maritime lien before he waived it for the mortgage security. Beawes, in his Lex Mercatoria, in discussing the duties of parties claiming an average contribution for the loss of goods thrown overboard in a storm, warns them "to take care to have the loss valued before the ship's discharge, in which the master ought to assist and settle all averages before he unloads." Beawes, 159. The decision of the court of king's bench in Simonds v. White, 2 Barn. & C. 805, that the adjustment of the average should be made according to the law of the place of the ship's destination, on delivery of the cargo, is based upon the fact that whether the loss falls upon the owner of the vessel, or upon other shippers, it is the duty of the captain to retain control of the cargo until the average is ascertained and paid, and see 11 Johns. 323. The first jettison was in October, and the second early in November, 1877. The schooner was employed wholly by the libellants at the time in transporting freight and merchandise to and from the port of Millville. She continued in their employ and made several trips after the loss. Although the libellants had frequent opportunities of proceeding against the vessel, they refrained from taking any steps to enforce an average contribution for several months, and did not file a libel until after other parties having maritime liens arrested the vessel.

It would seem from the testimony of Mr. Cranshaw, the general manager of the libellants, that some arrangement was entered into between the captain, as owner, and Mr. Walter Wood, one of the libellants, by which proceedings against the vessel were waived or postponed, and also against the captain, who it is said "promised to make all right, and who wanted the delay, as he was hard up for the cash." The schooner was purchased at the marshal's sale by the libellants, who retained the captain for a while as master. He was not made a witness in the case, and has now disappeared from the scene, quite willing, doubtless, to be relieved from the personal responsibility which he had assumed, and to have his debt paid from the proceeds of the vessel, in which he has no further interest. I think it would be inequitable to allow the libellants, in view of other facts, to maintain their lien and take these proceeds from a bona fide mortgage creditor whose claim largely exceeds the remnants in the registry, after the payment of prior admiralty liens. The libel must be dismissed with costs.